IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | | |
|---|---|---|
| JOHAN DANIYAN, | : | |
| Plaintiff : | | Civil Action |
| vs. | : | |
| | : | NO. 07-cv-02734 (JHR)(JS) |
| BORGATA HOTEL CASINO, | : | |
| Defendant. : | : | |

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S

## CLAIMS UNDER THE ADA AND THE NJLAD

On the Brief:

Nancy A. Valentino, Esquire
0453
COOPER LEVENSON APRIL
NIEDELMAN & WAGENHEIM, P.A.
1125 Atlantic Avenue - Third Floor
Atlantic City, NJ  08401
(609) 344-3161
nvalentino@cooperlevenson.com
Attorney for Defendant
Marina District Development Company, LLC
d/b/a Borgata Hotel Casino & Spa

## I.   INTRODUCTION

In order for plaintiff to make a prima facie case of employment discrimination pursuant to the Americans with Disabilities Act (hereinafter "ADA") or the New Jersey Law Against Discrimination (hereinafter "NJLAD") he is required to prove that he had a disability at the time of the alleged discrimination.  Plaintiff is unable to prove that he had a disability as of June 20, 2005.  Accordingly, all claims of discrimination and/or retaliation made pursuant to both the ADA and the NJLAD, should be dismissed.

## II.   FACTS

Plaintiff's medical expert, Dr. Arthur Tiger, testified that he has evaluated plaintiff on two separate occasions at the request of plaintiff's attorneys.  The first evaluation was conducted in January of 2008, over 2 ½ years after his work related injury which occurred on June 11, 2005.  The second evaluation was conducted on August 4, 2008, over 3 years post incident.  At no point during his trial testimony did Dr. Tiger opine that plaintiff was disabled or handicapped at the time of his termination on June 20, 2005.

Dr. Tiger was asked specifically whether during his evaluation he asked plaintiff what his complaints were in June of 2005, to which Dr. Tiger responded he had not.  (See Dr. Tiger's trial testimony, conducted on January 11, 2011 (hereinafter "Tiger") and attached hereto as Exhibit "A", 150:20-22).  Dr. Tiger was also asked whether he had any information independent of what Dr. Zuck, the treating physician at the time of the incident, had found with respect to plaintiff's level of functioning or ability to function during that timeframe.  Dr. Tiger responded that he had no further information with respect to plaintiff's level of functioning in June of 2005 other than the findings of Dr. Zuck. (Tiger, 151:16-20).

In fact, the only evidence in the record of plaintiff's level of functioning as of June and July of 2005, is the findings of both subjective and objective tests conducted by treating orthopedist Dr. Zuck, all of which were normal. (Tiger, 139:24 to 143:16; 144:13 to 145:4; 145:14 to 146:3; 146:15 to 147:9; 147:16 to 148:14; See also the treatment notes of Dr. Zuck dated June 14, 2005 and July 20, 2005, attached hereto as Exhibit "B") In contrast, Dr. Tiger does not opine as to plaintiff's level of functioning at the time of his termination in June of 2005. In addition, Dr. Tiger's report prepared in connection with this matter indicates that he can not give an exact diagnosis or degree of permanency even as of the time of his exam in August of 2008. (Tiger, 132:24-25).

### III.    LEGAL ARGUMENT

### A.    PLAINTIFF HAS FAILED TO SET FORTH ANY EVIDENCE THAT HIS ALLEGED DISABILITIES RENDER HIM A MEMBER OF A PROTECTED CLASS.

Plaintiff has made claims of discrimination under the New Jersey Law Against Discrimination (NJLAD) and/or American's with Disabilities Act (ADA) claiming he was wrongfully terminated due to his alleged back disability. Plaintiff further contends that he was discriminated and/or retaliated against based upon defendant's alleged failure to accommodate or engage in the interactive process. The NJLAD and ADA are "governed by the same standards and burden of proof structures applicable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. . ." *Keller v. Orix Credit Alliance Inc.*, 105 F.3d 1508 (3rd. Cir. 1997), *Waldron v. SL Industries, Inc.*, 849 F.Supp. 996, 1000 (D.N.J. 1994) *Erickson v. Marsh & McLennan Co.*, 117 N.J. 539 (1990); *Clowes v. Terminix Int'l, Inc.*, 109 N.J. 575 (1988). Therefore, the determination of plaintiff's claims for disability discrimination shall follow the same burden shifting analysis.

## 1. Plaintiff Is Unable To Establish A Prima Facie Case Of Disability Discrimination.

Plaintiff claims he was discriminated against because of an alleged disability when he was wrongfully terminated.  To establish a prima facie case when a plaintiff has alleged that his termination was based upon unlawful disability discrimination, the plaintiff must prove:

  (1) he was handicapped;
  (2) that he was qualified for the position, also described as performing his job at a level that met his employer's legitimate expectations;
  (3) that he nevertheless was terminated; and
  (4) that he was replaced by someone of equal or less qualifications and a non-protected class.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, S.Ct. 1817, 36 L.Ed.2d. 668 (1973); *Keller v. Orix*, 105 F.3d. 1508, citing, *Sempier v. Johnson & Higgins*, 45 F.3d. 724, 728 (3d. Cir. 1995). *Viscik v. Fowler Equipment*, 173 N.J. 1 (2002).

In the present matter, plaintiff can not meet the prima facie case of disability discrimination as he can not establish that he was disabled and thus belongs to a protected class. First, plaintiff can not establish that alleged the condition, the back sprain, rises to the level of a disability.  Second, plaintiff can not prove that he was ever regarded as disabled for the alleged back sprain.  It is unclear whether plaintiff argues that he was discriminated against because he was disabled or because Borgata "regarded" him as disabled.  In either case, plaintiff has failed to prove that he was actually disabled and/or defendant knew of his alleged disability at any time, up to and including the time of his termination from the Borgata.

## 2. Plaintiff Has Not Proven That His Back Injury Is A Disability

Plaintiff was diagnosed with a back sprain on June 11, 2005, following a fall at Borgata, and was authorized to return to work full duty on June 17, 2005.  Plaintiff received emergency treatment on the date of incident, 6/11/05 and was released later that evening with pain

4

medication. Thereafter, plaintiff reported to the Borgata workers compensation doctor, Dr. Glen Zuck, on June 14, 2005. Dr. Zuck performed an evaluation and determined that plaintiff could return to work full duty on June 17, 2005. (See plaintiff's return to work slip attached hereto as Exhibit "C")

A handicap under the NJLAD may be physical or non-physical. *Clowes v. Terminix Int'l, Inc.*, 109 N.J. 575 (1988). Although there is not an exhaustive list of physical handicaps, N.J.S.A. 10:5-5(r), lists paralysis, amputation, lack of physical coordination and blindness as physical handicaps. A condition labeled as a disability, handicap or disease for purposes of clinical research or medical treatment is not necessarily a "handicap" for purposes of the LAD. It has been held that a back sprain does not constitute a physical handicap which requires accommodation. N.J. Attorney General Formal Opinion No. 1-1989, pp 2-3 (Oct. 6, 1989), 125 N.J.L.J. 100, (Jan. 11, 1990) The ADA defines "disability" as: a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarding as having such an impairment. 42 U.S.C. §12102(2). It has been held that a back sprain is not a disability within the ADA. *Halperin v. Abacus Technology Corporation,* 128 F.3d 191, 200 (4th Cir. 1997).

In *Clowes v. Terminix Int'l, Inc.*, 109 N.J. 575 (1988) the Court held that the relevant time period with regard to an alleged handicap was at the time of an employee's discharge. The Court further held in that matter that plaintiff failed to prove he was handicapped at the time of his discharge as there was no testimony on the record that plaintiff was an alcoholic at the time of discharge. *Clowes* at 597. In *Viscik v. Fowler Equipment,* 173 *N.J.* 1, 800 A.2d 826 (2002), the Court held that where an existence of a handicap is not readily apparent, expert medical evidence is required. See *Clowes, supra,* 109 *N.J.* at 591-93, 538 A.2d. 794; *Rogers v. Campbell*

*Foundry,* 185 *N.J.Super.* 109, 112, 447 A.2d 589 (App.Div.1982). Accordingly, courts place a high premium on the use and strength of objective medical testimony in proving the specific elements of the statute. *Viscik* at 16. In the present matter there is no medical testimony indicating that plaintiff was handicapped as of June, 2005. The initial treating physician, Dr. Hawkins at the Atlantic City Medical Center, determined that plaintiff was able to return to work full duty on June 14, 2005. (See note of Dr. Hawkins attached hereto as Exhibit "D") Plaintiff then reported to the Borgata Medical Unit and June 13, 2005 and was given a referral to orthopedist Dr. Glenn Zuck for the next day, June 14, 2005. Plaintiff was examined and treated by Dr. Zuck on June 14, 2005. All findings were normal with regard to the tests administered during the examination and he found plaintiff was able to return to work full duty as of June 17, 2005. Therefore, according to both physicians who treated plaintiff at the time of the incident in 2005, plaintiff had no medical limitations as of June 17, 2005. Accordingly, plaintiff was clearly not disabled at the time of his termination.    Plaintiff has not provided one scintilla of evidence to prove that a back injury of the nature sustained by plaintiff constitutes a disability under either the NJLAD or ADA.

Plaintiff's expert, Dr. Tiger, authored reports as a result of the evaluations he performed on plaintiff in January and August of 2008. In neither one of his reports did he indicate that plaintiff had any restrictions or limitations at the time of his slip and fall in June of 2005. In addition, when he testified at trial he offered no testimony indicating that plaintiff had any restrictions or limitations as of June, 2005. (Tiger, 151:16-20).

In addition, plaintiff can not establish that Borgata perceived him as disabled as a result of the alleged back injury. According to federal courts, "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the

employee as disabled or that the perception caused the adverse employment action." *Kelly v. Drexel University*, 94 F.3d. 109 (3rd Cir. 1996); *Reeves v. Johnson Controls World Services, Inc.*, 140 F. 3d 144 (2d Cir. 1998). In the present matter, Borgata was aware plaintiff had fallen; however, the employer did not regard him as disabled and had received documentation indicating plaintiff could return to work full duty on June 17, 2005.

Plaintiff has not produced any evidence in this matter to support the claim that this back injury constituted a disability pursuant to the ADA or the NJLAD. Therefore, plaintiff is unable to establish that he is a member of a protected class and any and all claims under the ADA and NJLAD should be dismissed as a matter of law.

## IV.    CONCLUSION

Plaintiff has failed to come forth with any evidence showing that he was disabled as of the time of his termination on June 20, 2005. In fact, all of the evidence with respect to plaintiff's physical condition following his fall on June 11, 2005, clearly indicates that plaintiff was able to return to work full duty without restrictions as of June 17, 2005. Accordingly, plaintiff has failed to make a prima facie case of discrimination and/or retaliation under either the ADA or the NJLAD, and all claims made pursuant to same should be dismissed.

COOPER LEVENSON APRIL NIEDELMAN
& WAGENHEIM, P.A.

By: _____
NANCY A. VALENTINO, ESQUIRE
Attorney for Defendant, Marina District
Development Company, LLC d/b/a Borgata
Hotel Casino & Spa

DATED: JANUARY 18, 2011
CLAC; 514948.1

7

E X H I B I T   "A"

1   that correct?

2   A.   Yes.

3   Q.   The next sentence on, the degree of disability that he

4   has, and an exact diagnosis, really depends on review of

5   adequate objective tests such as an MRI.   Correct?

6   A.   Yes.

7   Q.   It goes on to say I did ask the patient's mother to

8   obtain the results of his MRI and forward them to you or my

9   so that I can review them.   Correct?

10  A.   Yes.

11  Q.   This is a report you sent to Mr. Daniyan's lawyers?

12  A.   That's correct.

13  Q.   Would you expect that if you sent a letter like that to

14  an attorney who represents an individual that you would get

15  the MRI report if one existed?

16           MR. FILOSA:   Objection.

17           THE COURT:   Sustained.

18  Q.   And you haven't gotten any report.   Correct?

19  A.   Correct.

20  Q.   The last sentence you you write in that report is "at

21  this point in time," and I guess that would have been in

22  August of 2008, correct?

23  A.   Yes, sir.

24  Q.   "At this point in time it would be difficult to state

25  his degree of permanency or the exact diagnosis unless I do

1   Q.   That means that the area was tender when doctor palpated

2   it?

3   A.   Yes.

4   Q.   Touched it, correct?

5   A.   Yes.

6   Q.   The next sentence says I had minimal denied err

7   necessary about the, and I can't pronounce that word,

8   coccygeal region, correct?

9   A.   Yes.

10  Q.   That would be the area around the coccyx, right?

11  A.   That's correct.

12  Q.   Now, if this incident involving Mr. Daniyan at work has

13  grossly been described as falling on his tail bone, is that

14  what we are talking about, the coccyx is referred to as the

15  tail bone?

16  A.   That is, yes, that's correct.

17  Q.   That last vertebrae you feel at the bottom of your

18  spine?

19  A.   Yes.

20  Q.   According to Dr. Zuck's contemporaneous evaluation of

21  Mr. Daniyan in June of 2005, he had minimal tenderness in

22  that area.  Correct?

23  A.   Correct.

24  Q.   Next sentence says neurovascular status was normal.  Do

25  you see that?

1  A.    Yes.

2  Q.    What does that mean?

3  A.    That means he had a normal neurological examination.  He

4  had his reflexes tested, sensation, muscle strength and these

5  were normal.

6  Q.    It goes on to say range of motion was just slightly

7  restricted but otherwise functional.  Do you see that?

8  A.    Yes.

9  Q.    Next sentence says his gate pattern was normal.

10  Correct?

11  A.    Yes.

12  Q.    And doctors, orthopedic doctors, evaluate gate patterns,

13  correct?

14  A.    Yes.

15  Q.    And what is the significance of a normal gate pattern?

16  A.    Well, his injury did not restrict his ability to walk.

17  Q.    And by the way, Doctor,  in either of your reports do

18  you indicate any specific functional limitations that Mr.

19  Daniyan has?

20  A.    No.

21  Q.    Getting back to the June 14, 2005, note.  The next

22  sentence says he could stand on his toes and heals

23  independently.  Do you see that?

24  A.    Yes.

25  Q.    Is that a method of testing that you use in evaluating

1   individuals with injuries?

2   A.    Yes.

3   Q.    And first of all, how do you do that?  What do you ask

4   the patients to do?

5   A.    Well, you ask them to get up on his toes, much like a

6   ballet dancer.  And then you might ask him to do it on one

7   foot.  Then you will ask him to get up on his heals.  And try

8   to take a few steps.

9   Q.    Okay.  And when that is noted as, it is floated that he

10  could stand on his toes and heals independently, that would

11  be a normal finding?

12  A.    Yes.

13  Q.    Indicating that at least with respect to that test there

14  was no indication of any ongoing pathology for injury.

15  Correct?

16  A.    Correct.

17  Q.    The next sentence says, reflexes of the patella and

18  achilles were equal and symmetrical, correct.  Is that when

19  you get out that little hammer and hit the knee and the heal?

20  A.    Yes, sir.

21  Q.    And when it is equal and symmetrical, what does that

22  mean?

23  A.    That means there was no nerve injury.

24  Q.    Then it goes on to say that there was no evidence of

25  clonus?

```
1    A.    Clonus.

2    Q.    Or myelopathy?

3    A.    Yes.

4    Q.    What is the significance of that?

5    A.    What he is doing is he is testing for upper motor neuron

6    injuries, such as a spinal cord compression, as opposed to a

7    peripheral nerve injury.  That gets kind of come reply

8    indicated, but he did not have this.

9    Q.    So the significance is that his findings were normal in

10   that regard.  Correct?

11   A.    Yes, yes.

12   Q.    The next sentence says, sensory examination of the lower

13   extremities was normal.  Do you see that?

14   A.    Yes.

15   Q.    Describe for us what a sensory examination of the lower

16   extremities would be?

17   A.    Well, you do that in any number of ways.  Can you do it

18   with a Q-tip.  You can do it with what I call a pin wheel.  I

19   do them with one or the other.  And you do that, there are

20   certain dermatones that are affected by certain nerves coming

21   out of the back and you can test by, by finding an abnormal

22   sensation in one particular area, it can direct you to a

23   particular level in the back that is injured.

24   Q.    What is the significance of the normal finding in that

25   regard?
```

1   A.   There wasn't any nerve injury.

2   Q.   And the last indication is sitting root sign normal as

3   was straight leg raising.   I guess that is two different

4   tests?

5   A.   Yes.

6   Q.   What is the sitting root sign?

7   A.   Well, there are signs again that test nerve injuries.

8   And these were normal.

9   Q.   And straight leg raising is I guess when somebody is

10  seated and asked to raise their legs?

11  A.   You can do it seated or you can do it with the patient

12  lying on his back on the examination table.

13  Q.   That once again was normal?

14  A.   Yes.

15  Q.   What would that signify as an examining physician?

16  A.   No nerve injury.

17  Q.   Now, when you evaluate patients, is it fair to say that

18  with respect to certain tests there are more than one way,

19  more than one way to do it?

20  A.   Every doctor has, I would say, his own style of doing

21  things.

22  Q.   Okay.   Are there certain things that you ask patients to

23  do for the purposes of determining whether or not they are

24  presenting to you in an accurate fashion?

25  A.   Yes.

1    Q.    For instance, if you were to ask me to bend at the hip,

2    which would be just to bend this way, and I would tell you at

3    a certain point in time I had a lot of pain, I couldn't do it

4    any more?

5    A.    Yes.

6    Q.    Would there be any way to test to see whether or not

7    that was an accurate reflection of my pain?

8    A.    Well, you can put a patient flat on the table and try to

9    lift their leg up, or you can have them sitting a table and

10    again lift their leg up.  Or you can ask them to get

11    undressed, when you are in the room with them, and observe

12    them bending over as they take off their shoes and socks.

13    Q.    All right.  Now, you have another similar total comp

14    care report from Dr. Zuck.  This one was from his last

15    evaluation of Mr. Daniyan dated July 20, 2005.

16    A.    Yes.

17    Q.    And once again, this is in or around the time of his

18    work related accident.  Correct?

19    A.    Yes.  Seven, 8 weeks after.  Six.

20    Q.    The second paragraph begins with physical examination,

21    correct?

22    A.    Yes.

23    Q.    It begins with physical examination did reveal

24    tenderness about the lower lumbosacral coccygeal region,

25    correct?

1    A.    Yes.

2    Q.    That once again would be when doctor pushed it, Mr.

3    Daniyan would have subjectively indicated pain.   Correct?

4    A.    Yes.

5    Q.    That is not an objective finding.   Correct?

6    A.    Well, if you go back and do it repetitively, you want to

7    make sure it is a real finding, that is what I try to do.

8    Q.    But you are relying upon the patient reporting to you as

9    opposed to some objective test.   Correct?

10   A.    You are relying on a patient reporting to you, but that

11   is part of the examination process.   That is part of the art

12   of examining a patient.   You balance one thing against

13   another.

14   Q.    The report goes on to indicate there was an absent,

15   there was the absence of any paravertebral muscle spasm,

16   correct?

17   A.    Yes.

18   Q.    That would be a normal finding, correct?

19   A.    Correct.

20   Q.    The next sentence says there was a functional range of

21   motion of his lumbar sacral spine with discomforts at the

22   extremities of motion with side bending and trunk rotation?

23   A.    Yes.

24   Q.    It goes on to say there was poor voluntary flexion from

25   the waist in a standing position, as he would flex to 50

1    degrees before stating that his coccygeal pain was

2    reproduced.  Do you see that?

3    A.    Yes.

4    Q.    Read the next sentence to the jury.

5    A.    He was able to sit with his hip flexed 90 degrees on the

6    examination table.  Otherwise comfortably.

7    Q.    Do you agree with me that those two findings, in other

8    words, the request for him to flex at the hip and complaining

9    of pain at a certain point, and flexing well beyond that

10   seated, those are inconsistent findings?

11   A.    Not really.  Because when you are in a sitting position

12   your knees are bent and they can relax hamstring muscles.

13   And by relaxing the hamstring muscles you with bend your back

14   a little bit further.

15   Q.    His gate pattern was normal.  We already talked about

16   that, correct?

17   A.    Yes.  I am sorry.

18   Q.    Provocative testing and radiculopathy were normal,

19   correct?

20   A.    Yes.

21   Q.    What is provocative testing?

22   A.    He was testing for any nerve injury.

23   Q.    Okay.  So there was no evidence of any nerve injury.

24   Correct?

25   A.    Correct.

1    Q.    And the radiculopathy references testing for a nerve

2    injury?

3    A.    Correct.

4    Q.    Such as one might expect if there was a disk involved,

5    correct?

6    A.    Correct.

7    Q.    Straight leg raised collateral straight leg raise,

8    Lasay, and sitting root sites were normal.  Correct?

9    A.    That's correct.

10   Q.    Now, we talked about straight leg raise.  What is contra

11   lateral straight leg raise?

12   A.    That means you raise one leg and you ask a patient if

13   there is pain shooting down the other leg.

14   Q.    Okay.  We didn't, what is a Louisiana saying test?

15   A.    Lasay test is similar to a straight leg test.

16   Q.    It goes on to say, so these findings are all normal.

17   Correct?

18   A.    Yes.

19   Q.    It goes on to say reflexes were equal and symmetrical?

20   A.    Yes.

21   Q.    And is that reflective of a lack of any nerve

22   involvement?

23   A.    That is.

24   Q.    A normal finding?

25   A.    Yes.

```
 1   Q.   It goes on to say sensory examination was normal?
 2   A.   Yes.
 3   Q.   And that there was no evidence of clonus or my lop
 4   Pennsylvania think and we talked about that already, correct?
 5   A.   Yes.
 6   Q.   Very Dr. Zuck goes to indicate in the last sentence,
 7   x-rays not reviewed to date were obtained of the coccygeal
 8   sacral region.  Do you see that?
 9   A.   Yes.
10   Q.   Osseus structures appeared normal, no evidence of a
11   fracture?
12   A.   Yes.
13   Q.   And the final diagnosis was a contusion.  Correct?
14   A.   Yes.
15   Q.   And you agree with that, do you not?
16   A.   I agree that that was one of his diagnoses.
17   Q.   That was his only diagnosis, correct?
18   A.   I believe that was part of his diagnosis.
19   Q.   Do you see any other diagnosis other than?
20   A.   According to Dr. Zuck, that was his diagnosis.
21   Q.   That was my question.
22   A.   I understood your question.  Your question was according
23   to Dr. Zuck, that was the diagnosis.  Yes.
24   Q.   I am asking you what Dr. Zuck's diagnosis was in 2005,
25   when he examined Mr. Daniyan.
```

```
 1   A.    Yes.

 2   Q.    And the last time you had any interaction with him, as

 3   we have already talked about, was the two occasions in 2008,

 4   correct?

 5   A.    Correct.

 6   Q.    Do you know what Mr. Daniyan did between the time of his

 7   accident in June of 2005, and when he first saw you in 2008?

 8   A.    No.

 9   Q.    What he did on a daily basis, what his activities of

10   daily living with, what his physical condition was, anything

11   of that nature?

12   A.    I didn't go into specifics.

13   Q.    Did you ask him, did you ask him when you met with him,

14   before today, between the time of the accident, and when I am

15   seeing you, Mr. Daniyan, tell me what you have been doing?

16   A.    I asked him what his complaints were.

17   Q.    You asked him what his complaints were as of the day

18   that you were evaluating him, correct?

19   A.    Yes.

20   Q.    Did you ask him what his complaints were in June of

21   2005?

22   A.    No.

23   Q.    Other than the information that Dr. Zuck prepared and

24   the information that you have seen from the Atlantic City

25   Medical Center records, you don't have any information
```

1    concerning what his complaints were in June of 2005.  Is that

2    correct?

3    A.    Correct.

4    Q.    Do you know, for instance, that in 2006, Mr. Daniyan

5    enrolled, and completed, a course of study, in massage

6    therapy?

7    A.    No.

8    Q.    Do you know that before I told you?

9    A.    I said no.

10   Q.    Did you meet with the attorneys that are representing

11   Mr. Daniyan before coming into court today?

12   A.    Briefly.

13   Q.    Was there any discussion about Mr. Daniyan's activities

14   between those two dates?

15   A.    No.

16   Q.    Do you have any information independent of what Dr. Zuck

17   found in and around June and July of 2005 with respect to Mr.

18   Daniyan's level of functioning or ability to function during

19   that timeframe?

20   A.    No.

21   Q.    And as I understand what you believe your focus was, was

22   in order to determine what Mr. Daniyan's condition was when

23   you examined him, correct?

24   A.    Yes.

25   Q.    Because you, that is the best you could do, you can

1    of permanency of Mr. Daniyan?

2    A.    My opinion was that he had a permanent injury to his

3    lower back.

4    Q.    Now, opposing counsel has walked you through the x-rays,

5    than the CAT scan.  Now, the x-ray that we have gone through.

6    You had indicated that it was a normal result.

7    A.    Yes.

8    Q.    Would, is it possible that, is it possible for a patient

9    to still suffer pain with a normal x-ray report?

10            MR. LICHTENSTEIN:  Objection, your Honor.  First of

11   all it is beyond the scope of cross examination.  And it was

12   covered on direct.

13            MR. FILOSA:  It is not beyond the scope of the

14   cross.  I am just trying to get further testimony with

15   respect to the, how the jury should interpret this reported,

16   or the results of this report.  I think it would be helpful

17   for the jury to understand what effect the -- what effect a

18   normal result, an x-ray report, could have on Dr. Tiger's

19   conclusion.

20            THE COURT:  Again, I think the way the cross

21   examination went, it would be appropriate to specifically

22   define the significance of what each testing meant, with

23   respect to his opinion.

24   Q.    Dr. Tiger, what was the significance of the normal x-ray

25   report?

# E X H I B I T   "B"

## *Total Comp Care*

### PACE

*Orthopedics and Sports Medicine*

Glenn Zuck, D.O.
Raymond Weland, D.O.
David Anapolle, M.D.

DATE:          June 14, 2005
PATIENT:       Johan Daniyan
EMPLOYER: Borgata Hotel/Casino          INSURANCE: NJM
RISK MGR: Susan Guld                    ADJUSTER:  Alex
PHONE:         317-1075                 PHONE:
CONTACT:   Medical Unit                 FAX:          704-8737
PHONE:         317-1103
FAX:
DOI:           06/11/05

W005013278

### INJURY INFORMATION

The patient is a 27-year-old heavy porter employed by Borgata Hotel/Casino. He provides a history of sustaining a fall onto his coccygeal and low back area on 06/11/05 when he was returning from emptying two trash cans. Upon carrying these trash cans back from the dumpster, he slipped on coffee and then landed onto his tailbone and low back. He denies any loss of consciousness. He has denied any motor or sensory deficits referable to his lower extremities. His bowel and bladder function remain normal. He has pain with attempted sitting as this reproduces pain in the tailbone area.

Johan denies any previous injuries to his low back. He denies any weakness of lower extremities. The patient was seen at Atlantic City Medical-Center-City Division following this injury.

X-rays were not available for review, however, there was reportedly the absence of any osseous or soft tissue pathology. The official report and films are pending.

Physical examination did reveal tenderness to palpation about the lumbosacral region. He had minimal tenderness about the coccygeal region. Neurovascular status was normal. Range of motion was just slightly restricted but, otherwise, functional. His gait pattern was normal. He could stand on his toes and heels independently. Reflexes of the patella and Achilles were equal and symmetrical. There was no evidence of clonus or myelopathy. Sensory examination of the lower extremities was normal. Sitting root sign normal as was straight leg raising.

### DIAGNOSIS

Coccygeal/lumbar spine contusion.

**RECEIVED**

JUN 28 2005

**WCC**

DANIYAN, JOHAN

0046140001050616

Confidential - PHI

JD0008

RE:          JOHAN DANIYAN
DATE:        June 14, 2005
Page 2

TREATMENT PLAN

An official report from Atlantic City Medical Center regarding his x-rays is pending. I have provided him with a low back brace and instructed him on the use of such for lifting and carrying at work. In addition, a short course of formal physical therapy and medications for antiinflammatory use and muscle relaxation/pain was provided. He was instructed to discontinue his medications should any side effects occur, and he was also instructed to contact me should his symptoms progress in nature.

WORK STATUS

Full duty 06/17/05.

_____
Glenn M. Zuck, D.O.
GMZ:amt.dmj
Dictated, not read
JN: 31470924

RECEIVED

JUN 2 8 2005

WCC

Confidential - PHI

JD0009



W 2005·013278

# *Total Comp Care*

### *PACE*
*Orthopedics and Sports Medicine*

Glenn Zuck, D.O.
Raymond Weiand, D.O.
David Anapolle, M.D.

DATE:    July 20, 2005
PATIENT:   Johan Daniyan
EMPLOYER: Borgata Hotel/Casino
RISK MGR: Susan Guid
PHONE:    317-1075
CONTACT:  Medical Unit
PHONE:    317-1103
FAX:
DOI:      06/11/05

INSURANCE: NJM
ADJUSTER:  Alex
PHONE:
FAX:       704-8737

### INJURY INFORMATION

Johan was reevaluated today. Present at the time of this evaluation was his mom and his grandmother. Johan describes having discomfort about the sacrum, and this leads to discomfort when he is in a sitting and lying position directly on the sacral and coccygeal region. He denies any radicular symptoms referable to his lower extremities. His bowel and bladder function remain normal.

Physical examination did reveal tenderness about the lower lumbosacral/coccygeal region. There was the absence of any paravertebral muscle spasm. There was a functional range of motion of his lumbosacral spine with discomfort at the extremes of motion with side bending and trunk rotation. There was poor voluntary flexion from the waist in the standing position, as he would flex to 50 degrees before stating that his coccygeal pain was reproduced. He was able to sit with his hip flexed 90 degrees on the exam table, otherwise, comfortably. His gait pattern was normal. Provocative testing and radiculopathy were normal. Straight leg raise, contralateral straight leg raise, Lasegue, and sitting root signs were normal. Reflexes were equal and symmetrical. Sensory examination was normal. No evidence of clonus or myelopathy.

X-rays not reviewed to date were obtained of the coccygeal/sacral region. Osseous structures appeared normal. No evidence of a fracture.

### DIAGNOSIS

Coccygeal/sacral contusion.

DANIYAN, JOHAN
RECEIVED ...05
004614000105072...
WCC

Confidential – PHI

JD0016

RE:          **JOHAN DANIYAN**
DATE:      July 20, 2005
Page 2

## TREATMENT PLAN

Continued conservative course of treatment recommended, and he will see me back on a p.r.n. basis. He has reached maximum medical improvement. There is no evidence of radiculopathy or progressive neuropathy. His examination was, otherwise, unremarkable for any clinical abnormality.

## WORK STATUS

Full duty.

_____
Glenn M. Zuck, D.O.
GZ:amt.dmj
Dictated, not read
JN: 32014325

RECEIVED

AUG 0 8 2005

WCC

Confidential - PHI

JD0017

# E X H I B I T   "C"



**PACE**
REHABILITATION AND SPORTS MEDICINE

TOTAL COMP CARE

PATIENT DISABILITY / INSTRUCTION FORM

NAME : _Jolban Dhmiyani_      DATE: 6/14/15

EMPLOYER: _Burynda H/C_

DATE OF INJURY: 6/11/05

DIAGNOSIS: _coccygeal / Lb. pain_

WORK STATUS:

☒ No Work
☐ Modified Duty          Expected date of return: _____
☒ Full Duty 6/17/05      Expected date of return: 6/17/05

RESTRICTIONS:

☐ Sedentary work only
☐ Standing 30 minutes/hour
☐ Standing/walking unrestricted
☐ No repetitive bending/stooping/kneeling
☐ No running or ladder climbing
☐ No repetitive use of right/left upper extremity
☐ No lifting with right/left upper extremity more than _____ lbs.
☐ Other: _____
_____
_____

☐ Discharged from care
☐ MMI
☐ Date of next appointment: _____
☒ No appointment

Doctor Signature: _____

GLENN ZUCK, D.O.    RAYMOND WEIAND, D.O.    DAVID ANAPOLLE, M.D.
847 NEW ROAD, SOMERS POINT, NEW JERSEY 08244 – 609 – 927 – 0200  FAX: 609 – 927 – 1810
131 JIMMIE LEEDS ROAD, GALLOWAY, NEW JERSEY 08205 – 609 – 748 – 3700  FAX: 609 – 748 – 2116
1016 RT. 9 SOUTH SUITE 101, CAPE MAY COURT HOUSE, NEW JERSEY 08210 – 609 – 465 – 0660  FAX: 609 – 465 – 0663

** TO THE PATIENT **
It is your responsibility to show this form to your employer/supervisor immediately.

JUN-15-2005   10:36
Confidential - PHI                    95%              P.03

JD0010

# E X H I B I T   "D"

# lantic City
### M E D I C A L   C E N T E R

**Emergency Department Medical Clearance**

City Division (609) 344-4081 _____ Mainland Division (609) 652-1000

W2005 - 017278

A0516200240   EMR  007478026

DANIYAN,JOHAN E                        CER
211 WEYMOUTH RD    MBS 27Y
ELWOOD        NJ 08217    609-567-7417
SIMPSON,ELLA  GRA         609-567-7417
BORGATA CASINO 168667765
ER,PROVIDER    06/11/05  06/20/77

Patient Name _____                                    Date of Visit __6-11-05__

The above named pe_____                        _____r and left at ____23:30____

**Recommend:**                              **Restrictions:**

Return to work/school ____ now              ____ None
Nowork for __2__ days  TWO                  ____ Light duty/activity for _____ days
Noschool for _____ days                     ____ No operating of machinery for ____ days
NoGym for _____ days                        ____ Other _____

Medically Cleared for _____

Physician/Practitioner _____ MKHauken _____        Date: __6-11-05__

V (2/98)

Confidential - PHI

JD0033